**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FCSTONE, LLC,                             ) | |
|                                   ) | |
|                   Plaintiff,         ) | |
|                                     ) | |
|         v.                           ) | Case No.  1:10-cv-00508 |
|                                     ) | |
| SCOTT A. ADAMS, ROBERT W. WALFORD,  ) | Judge Ronald A. Guzman |
| SAMANTHA GARBERS-ADAMS and LISA   ) | |
| WALFORD                              ) | |
|                                   ) | |
|                   Defendants     ) | |

### DEFENDANTS SAMANTHA GARBERS-ADAMS' AND LISA WALFORD'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

Plaintiff's Motion to Compel (the "Motion") is a nonsensical hodgepodge of inaccurate statements and irrelevant legal theories that do not support Plaintiff's sweeping discovery requests and have nothing to do with the personal jurisdiction issue currently before the Court. Even if the requests were relevant, most of them are objectionable on well-settled grounds of privilege.  As such, the Court should deny Plaintiff's motion in its entirety.

***First***, Plaintiff's "closely related" theory of personal jurisdiction finds no support in any of its Complaint allegations; the case law it cites to support the theory is irrelevant to any issue before the Court; and the purported facts it adduces as "proof" of a "close relationship" are of no demonstrable relevance even to Plaintiff's own case law.

***Second***, Plaintiff's "agency" theory of personal jurisdiction is without merit.  Not only did Plaintiff fail to plead a single fact that would support such a theory, but the case law it cites in support of the theory is, once again, irrelevant to any issue before the Court.

1

***Third***, Plaintiff's theory that the New York declaratory judgment action somehow constitutes a concession to personal jurisdiction in Illinois is unsupported by any record fact and any case law.  Indeed, while Plaintiff makes the assertion early in its motion, it never even attempts to support it factually or legally elsewhere in its brief.

***Fourth***, Plaintiff's own case law regarding New York's marital privilege conclusively proves the propriety of Ms. Garbers-Adams' and Ms. Walford's ("the Wives") objections to most of Plaintiff's written discovery.  Especially in light of Plaintiff's theory that the Wives and their husbands "schemed" to "circumvent" the Settlement Agreement, Plaintiff's claim that communications between the Wives and their husbands in furtherance of this scheme covered merely "ordinary business matters" is simply nonsensical.

***Fifth***, Plaintiff's contentions regarding the Wives' attorney-client privilege objections are incoherent.  Any requests that implicate such privileged communications are presumptively objectionable, no matter what justification Plaintiff may advance for those requests, including its completely unsupported assertion that the Wives committed a "fraud" on the New York courts by filing a declaratory judgment action there.[1]  Likewise, communications between the Wives are privileged both as work product and as common interest/joint defense communications, because the Wives are aligned parties in both lawsuits.  (FRCP 26(b)(3).)

At base, Plaintiff's sweeping written discovery is of no demonstrable relevance to the personal jurisdiction issue now before the Court, and the Wives' specific objections to that discovery are entirely proper.  As such, the Court should deny Plaintiff's motion in its entirety.

---

[1] To the extent that New York does not recognize an accountant-client privilege, Plaintiff's arguments are moot anyway, because (1) most of the improper requests drew other objections, and (2) the Wives have already produced all materials available to them from the accountants.

# FACTUAL BACKGROUND[2]

## The Husbands' Trading Accounts and Settlement Agreements

Scott Adams and Robert Walford ("the Husbands") were customers of FCStone under separate contract terms governing their individual and joint trading accounts ("Trading Accounts"). The Wives' names appear nowhere on the Trading Accounts, the Wives did not sign any of the account documents, and the Wives never participated in any trading in the accounts.

The Husbands and FCStone settled certain disputes arising out of a deficit in the Trading Accounts by executing agreements set forth in settlement documents, including a Forbearance Agreement, a Promissory Note, and an Assignment of Income Tax Refunds, all dated March 11, 2009 ("the Settlement Agreements"). The Wives did not sign, nor are they even mentioned in, the Settlement Agreements.

The Forbearance Agreement provides that the Husbands shall, individually: (i) execute a promissory note to FCStone in the amount of $127,000,000.00; (ii) cause their federal, state, and local tax returns for 2009 to be prepared, and amend all prior tax returns as allowed by law to carry back losses; (iii) seek all reasonable federal, state, and city tax refunds available to them under proper application of law, and (iv) execute assignments of tax refunds to secure payment of the Note. The Wives did not sign, and are not referenced in, the Forbearance Agreement.

In compliance with the Forbearance Agreement, the Husbands executed a promissory note for the benefit of FCStone ("the Note"). The Wives did not sign, and are not referenced in, the Note. The Husbands also, individually, executed Assignments of Income Tax Refunds to FCStone ("the Assignments"). Each Assignment provides that: "Assignor assigns to Assignee

---

[2] Because the Wives have already detailed the factual background of this matter in their Motion to Dismiss, they will merely reiterate here those facts most relevant to Plaintiff's Motion to Compel.

LP 2341922.2 \ 37753-82139

all of *Assignor's interest* in the refunds *Assignor* may be entitled to receive." The Wives did not sign, and are not referenced in, the Assignments. That is, the Wives are not "Assignors" under the Assignments, only the Husbands are.

### The Husbands' and Wives' Amended Tax Returns

Scott Adams and his wife, Samantha Garbers-Adams, filed joint tax returns for the tax years 2005 to 2009 and later filed amended joint tax returns for the tax years 2005 to 2007. They may be entitled to joint tax refunds for these tax years. Pursuant to the Internal Revenue Code and to New York law, Samantha Garbers-Adams is legally entitled to a one-half share of each and every joint tax refund that she and her husband may receive.

Similarly, Robert Walford and his wife, Lisa Walford, filed joint tax returns for the tax years 2005 to 2009 and later filed amended joint tax returns for the tax years 2005 to 2007. They may also be entitled to joint tax refunds for these tax years. Pursuant to the Internal Revenue Code and to New York law, Lisa Walford is legally entitled to a one-half share of each and every joint tax refund that she and her husband may receive.

In sum, the Wives are not parties to the Forbearance Agreement, the Note, or the Assignment Agreements, and their respective one-half share of the joint tax return refunds has not been assigned to FCStone.

### The New York Declaratory Judgment Action

On December 28, 2009, in the face of Plaintiff's threats to assert claims against the Wives' personal assets, the Wives filed an action in the Supreme Court of the State of New York, County of New York, *Samantha Garbers-Adams and Lisa Walford v. Scott A. Adams, Robert W. Walford, and FCStone*, (Index No. 118152/09) (the "New York State Court Action"),

seeking a declaration, *inter alia*, that they are entitled to the one-half share of each and every joint tax refund, if any, that they and their Husbands may receive.[3]

The Wives based their claims in the New York State Court Action on the Internal Revenue Code, New York domestic relations and tax law, and the presumed over-payment of federal and state taxes through the joint tax returns that they and their husbands had previously filed. Contrary to Plaintiff's unsupported allegation (Motion ¶ 2), the Wives did not invoke, or rely upon, the Settlement Agreements to establish their ownership interest in any income tax refunds or their entitlement to a one-half share of such refunds.

**Plaintiff's Initial Complaint and the Wives' Motion to Dismiss**

On January 25, 2010, Plaintiff filed a Complaint in the Northern District of Illinois. In its Complaint, Plaintiff sought damages for breach of contract as against the Husbands and for a declaratory judgment and a constructive trust as against all defendants. Of particular relevance here, Plaintiff asserted that the Court had personal jurisdiction over the Wives on exactly two grounds: (1) that the Wives had "directly benefitted [sic]" from the Settlement Agreements, which provided for exclusive jurisdiction in the state and federal courts of Illinois; and (2) that the Wives had asserted rights to "assets that have been assigned to FCStone pursuant to the referenced agreements, and which would be received at FCStone's principal place of business in Chicago, IL." (Cmplt. ¶ 8.)

On March 15, 2010, the Wives moved to dismiss Plaintiff's Complaint for, among other things, lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). In the

---

[3] In its motion, Plaintiff boldly asserts that in the New York State Court Action, the Wives "falsely alleged that they and their husbands had filed their joint amended tax returns for prior years." (Motion ¶ 3.) Although the allegation is irrelevant to any issue before the Court, the record should be clear that at the time they filed their complaint, the Wives had already provided to their accountants all information necessary to complete amended returns and believed, in good faith, that such returns had been filed. Unbeknownst to the Wives, the amended returns were highly complex, and the accountants required several months to complete them.

5

motion, the Wives established that, as a matter of law (1) they were not intended third-party beneficiaries of the Settlement Agreements, and (2) the payment of monies into a state – assuming that the Wives had done, or had any obligation to do, this – is insufficient to establish personal jurisdiction.  (*See* Mtn. to Dismiss at pp. 7-8.)

On March 18, 2010, the parties appeared before the Court for presentment of the Motion to Dismiss.  During the hearing, the Court expressed significant doubt that it could exercise jurisdiction over the Wives, because the Wives had no contacts whatsoever with Illinois.  In response, Plaintiffs' counsel requested leave to amend Plaintiff's initial complaint to, among other things, add jurisdictional allegations.  The Court granted Plaintiff until March 24th to file such an amended complaint.

## Plaintiff's Amended Complaint and the Wives' Renewed Motion to Dismiss

On March 24, 2010, Plaintiff filed its Amended Complaint.  This Amended Complaint contained the identical jurisdictional allegations as to the Wives, save one:  Plaintiff now alleged that the Wives had "expressly request[ed] the [New York] court to construe and enter declaratory relief interpreting [the Settlement Agreements]."  (Am. Cmplt. ¶ 9.)  Not only is this assertion false, but it was known to Plaintiff at the time it filed its initial complaint in this action.

Although Plaintiff failed to set forth any additional jurisdictional allegations in the Amended Complaint, it did add wholly speculative allegations about a "scheme" among the Wives and the Husbands to deprive Plaintiff of its purported rights under the Settlement Agreements, including the forum selection clause.  (*E.g.,* Am. Cmplt. ¶ 35.)  This "scheme" supposedly involved the filing of the New York State Court Action months earlier and a hypothetical refusal to file amended tax returns if the New York State Court Action was unsuccessful – an eventuality that Plaintiff simply concocted out of whole cloth.  (*Id.*)

6

Because Plaintiff's Amended Complaint contained no additional jurisdictional allegations of any relevance (the declaratory judgment theory being both false and immaterial), the Wives simply re-filed their Motion to Dismiss on March 31, 2010, with only a few minor changes.

**Presentment of the Motion to Dismiss and the Allowance of Jurisdictional Discovery**

On April 7, 2010, the parties appeared before the Court on the Motion to Dismiss (and, unrelatedly, on Plaintiff's Motion for Partial Summary Judgment). After noting that the Court had previously stayed all discovery as against the Wives, the Wives' counsel informed the Court that the Amended Complaint contained no new jurisdictional allegations, such that the parties should move ahead with briefing on the Wives' Motion to Dismiss.

Plaintiff's counsel admitted the lack of new allegations in the section labeled "Jurisdiction" but countered that Plaintiff had elsewhere alleged a "scheme" that was relevant to the jurisdictional question. Specifically, Plaintiff's counsel, vaguely referencing Seventh Circuit case law, asserted that if the Wives were "closely related" to the dispute between Plaintiff and the Husbands, the Wives would be bound by the forum selection clause in the Settlement Agreements and would, therefore, be subject to the Court's jurisdiction. Counsel then asked for discovery regarding this purported "scheme."

The Wives' counsel immediately disputed the jurisdictional relevance of the "scheme" allegations and argued that counsel's vague references to Seventh Circuit law suggested a threshold legal issue that the parties should brief before any discovery occurred. That is, counsel said, if the referenced law did not support the theory, discovery – especially of parties not properly before the Court – would be inappropriate.

The Court then expressed a desire to address all jurisdictional issues, both legal and factual, at the same time. As such, the Court granted Plaintiff permission to take discovery

limited to the jurisdictional issue, including written discovery, by April 14th and depositions of the Wives by May 7, 2010.  The Court also ordered the Wives to respond to the written discovery by April 26th, a period eighteen days shorter than that provided under the Federal Rules of Civil Procedure.

**Plaintiff's Overblown Written Discovery and the Wives' Tempered Response**

On April 14th, Plaintiff served sweeping discovery that far exceeded the legitimate bounds of jurisdictional discovery and moved directly into substantive merits discovery. Included in this written discovery assault were 36 Interrogatories (with multiple sub-parts), 34 document requests (only two of which are relevant to personal jurisdiction), and *252* Requests to Admit.

Upon their initial review of the requests, the Wives' counsel immediately perceived that (1) the vast majority of the requests sought information irrelevant to any legitimate jurisdictional issue; (2) the vast majority of the requests were objectionable on the grounds of privilege; and (3) Plaintiff could obtain the necessary information far more efficiently through the depositions of the Wives, which the Wives are ready, willing, and able to give by the Court's May 7, 2010 deadline.  As such, on April 16th, the Wives' counsel reached out to Plaintiff's counsel in an effort to short-circuit the process and to keep the case moving forward.[4]  When a series of written communications failed to bear fruit, counsel arranged a conference call on April 22, 2010.[5]

During the April 22nd conference call, the Wives' counsel reiterated the burden and irrelevance of the discovery, along with the privileged and protected nature of the information that Plaintiff was requesting.  The Wives' counsel asked if Plaintiff could identify specific

---

[4]   The substance of these conversations is captured in the Wives' Motion for Protective Order and its attached exhibits.  As such, the Wives will not recount those discussions here.

[5] Not April 23rd, as Plaintiff erroneously claims in its Motion to Compel.  (*See* Motion ¶ 15.)

materials it needed in order to conduct depositions, and then address some of the Interrogatories and the 252 Requests to Admit during those depositions.  Plaintiff's counsel responded that Plaintiff could not amend any of its discovery requests, if at all, until the Wives specified their objections thereto.  Although this defeated the purpose of the phone call, the Wives' counsel agreed to provide a listing of objections to the Requests to Admit as soon as possible.

Later that same day, as part of their effort to assess the relevance of Plaintiff's Requests to Admit, the Wives' counsel asked Plaintiff's counsel to provide specific citations to the Seventh Circuit case law that counsel had mentioned in passing at the April 7th hearing.  As the Wives' counsel explained, the Wives could better assess the relevance of the Requests to Admit if they understood the legal basis, if any, for the Requests.  Oddly, Plaintiff's counsel Thomas Mikrut responded that because his colleague who had referred to Seventh Circuit law at the hearing was "on trial," Plaintiff could provide no guidance as to the case law that purportedly supported the Requests to Admit.  (Copy of email between Kurt Stitcher and Thomas Mikrut attached hereto as Exhibit A.)

The following day, Friday, April 23rd, the Wives' counsel provided Plaintiff's counsel with the promised list via email.  (*See* Motion, Exhibit G.)  As the email itself makes clear, the list was not comprehensive, in that the Wives' counsel had identified all privilege objections but had not identified all of the irrelevant Requests, if a privilege objection otherwise covered each Request.  (*Id.*)  As noted above, Plaintiff's failure to provide any case law to support the Requests hampered the ability of the Wives' counsel to evaluate relevance thoroughly.  The Wives' counsel closed his email by asking Plaintiff's counsel to review the listing and to determine whether and how Plaintiff might agree to modify its Requests to Admit.  Counsel also noted that with a looming deadline for written responses, the Wives would be forced to move for

a protective order if Plaintiff did not respond to counsel's email by the following Monday, April 26th.  (*See* Motion, Exhibit G.)  Plaintiff's counsel never responded to the email or provided any of the Seventh Circuit case citations.

On Monday, April 26th, the Wives filed a Motion for Protective Order with respect to the Requests to Admit and to certain of the remaining written discovery.[6]  They otherwise answered the Interrogatories and Requests for Production.

On Tuesday, April 27th, Plaintiff filed a "Motion to Compel and to Extend the Discovery Schedule."  Notably, Plaintiff was able to cite in its motion the very Seventh Circuit case law of which it had denied knowledge only two business days earlier.  Because this motion has no basis in law or fact, however, the Wives respectfully request that the Court deny it in its entirety.

## ARGUMENT

### I.   MUCH OF PLAINTIFF'S WRITTEN DISCOVERY IS IRRELEVANT TO AN EVALUATION OF PERSONAL JURISDICTION OVER THE WIVES.

In its motion, Plaintiff presents a dizzying and incoherent array of purported facts and law to support the relevance of its written discovery requests.   Indeed, the motion is a hodgepodge of unrelated case law, conflated arguments, and ultimate presumptions that make it almost impossible to understand.   Nonetheless, it appears that Plaintiff is attempting to advance three arguments in support of relevance.

First, Plaintiff asserts that it is entitled to discovery to show that the Wives are so "closely related" to the dispute between their Husbands and Plaintiff that the Wives may be bound by the forum selection clause in the Settlement Agreements.  In support of this "closely related" theory

---

[6] Plaintiff's argument that certain of the Requests to Admit must be deemed admitted under Fed. R. Civ. Pro. 36(a)(3) is without merit.  The Wives' Motion for Protective Order requested that this Court strike the Requests to Admit *in their entirety*.  The Wives do not have to respond to any of the Requests until there is a ruling on the Motion for Protective Order.  Moreover, there is no waiver here because the Wives were not given the 30 days to which they are entitled under the Federal Rules of Civil Procedure to respond to Requests to Admit.

of jurisdiction, Plaintiff argues that it must explore whether the Wives were part of a "scheme" to deny Plaintiff its contractual rights by failing to file amended returns in a timely fashion and whether the New York State Court Action is merely a "fake controversy" in furtherance of this alleged scheme.

Second, Plaintiff contends that the Wives have sought to benefit from the Settlement Agreements by seeking a declaration of their rights thereunder in the New York State Court Action. In Plaintiff's world, this declaratory judgment action subjects the Wives to the forum selection clause in the Settlement Agreements.

Third, Plaintiff avers that if the Husbands were acting as "agents" of the Wives in executing the Settlement Agreements, the Husbands' conduct can subject the Wives to personal jurisdiction in Illinois. Presumably, Plaintiff believes that its written discovery is relevant to this "agency" issue.

None of Plaintiff's assertions has any factual or legal merit with respect to the jurisdictional question now before the Court.

### A.   Plaintiff's "Closely Related" Theory Lacks Any Factual or Legal Support.

#### 1.   Plaintiff's Case Citations are Irrelevant.

Plaintiff bases its entire "closely related" theory of personal jurisdiction on two cases, *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1983), and *Frietsch v. REFCO, Inc.*, No. 92-C-6844, 1994 WL 494945, at *4 (N.D. Ill. Sept. 6, 1994). Neither one supports discovery into the theory Plaintiff advances here.

In *Hugel*, the individual plaintiff sought to extricate himself and two of his companies (GCM and OMI) from a forum selection clause in his membership agreement with Lloyd's ("the General Undertaking") when he sued Lloyd's for breaching an alleged confidentiality agreement

11

in connection with a Lloyd's investigation of Hugel and his companies, GCM (Hugel owned 99% of its stock) and OMI (a wholly-owned subsidiary of GCM).  Lloyd's allegedly gave the assurances of confidentiality only to Hugel, and Hugel alone decided that his corporations would participate in the Lloyd's investigation.  Hugel then supplied information about his two corporations to Lloyd's, which allegedly divulged that information to third parties.  Of course, GCM and OMI did not want to have to bring suit against Lloyd's for those disclosures in England, as required under the General Undertaking, so they asserted that, as non-parties to the General Undertaking, they could not be bound by its forum selection clause, despite the *defendant's* attempt to enforce it against them.

On appeal from a ruling in Lloyd's favor, the Seventh Circuit upheld the District Court's finding as not clearly erroneous.  In the Seventh Circuit's words:

> In order to bind a non-party to a forum selection clause, the party must be "closely related" to the dispute such that it becomes "foreseeable" that it will be bound. (Citations omitted.)  Hugel and Lloyd's contracted to settle all of their disputes in England. Although GCM and OMI were not members of Lloyd's, in the course of a dispute between Hugel and Lloyd's, Hugel alone involved his two controlled corporations and supplied information allegedly belonging to those corporations.  The district court found that ***the corporations owned and controlled by Hugel are so closely related to the dispute*** that they are equally bound by the forum selection clause and must sue in the same court in which Hugel agreed to sue.

*Hugel*, 999 F.2d at 210 (emphasis added).

In *Frietsch*, plaintiff investors sued German promoters and trustees of a commodity pool investment vehicle in the German courts, pursuant to trading account contracts that the plaintiffs had executed with those entities.  When the plaintiffs also sought to sue REFCO, which had established the commodity pools in the United States – pursuant to contracts between REFCO, on the one hand, and the promoters and trustees, on the other – REFCO claimed the benefit of

the forum selection clause in the German contracts, because the dispute "arose out of" those contracts.

The District Court upheld REFCO's right to employ the German forum selection clause, because the plaintiffs were attempting to hold REFCO liable for the conduct of its alleged German "agents."  As the court stated it, "if [the REFCO] defendants stand in the shoes of the [German] promoters for liability purposes, as plaintiffs have alleged, defendants also stand in the shoes of the promoters for purposes of the forum selection clauses." *Frietsch*, 1994 WL 494945 at *4.[7]

In both *Hugel* and *Frietsch*, then, it was a non-signatory **defendant** who sought the **protection** of a forum selection clause on the ground that it was "closely related" to the signatory that the clause actually bound.  Moreover, the cases that *Hugel* and *Frietsch* cite underscore this point.  *See, e.g., Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 (9th Cir. 1988) (upholding lower court's finding that related defendant companies were entitled to the benefit of a forum selection clause in the contract between the plaintiff and defendant Gucci Parfums); *Coastal Steel Corp. v. Tilghman Wheelbrator Ltd.*, 709 F.2d 190 203 (3rd Cir. 1983) (holding that a third party beneficiary to a contract is bound by the forum selection clause in that contract); *Clinton v. Janger*, 583 F. Supp. 284, 290 (N.D. Ill. 1984) (holding that third-party beneficiary defendants can claim the protection of a forum selection clause where they could be held liable for improper acts under the relevant contract).

None of these cases is relevant to Plaintiff's "closely related" theory of jurisdiction.  In this case, Plaintiff is attempting to use the forum selection clause as a sword against defendants

---

[7] Notably, the Seventh Circuit affirmed this holding on appeal.  In doing so, the Seventh Circuit observed that "courts in this country . . . enforce forum selection clauses **in favor of** non-parties 'closely related' to a signatory." Frietsch v. Refco, Inc., 56 F.3d 825, 827 (7th Cir. 1995) (citing *Hugel*, 999 F.2d at 209; *Manetti-Farrow*, 858 F.2d at 514 n.5).

who did not sign the underlying contracts, played no role in the conduct that led to the execution of the contracts, and do not want to be bound by the forum selection clause.  Plaintiff's cited cases simply provide no support for the application of the forum selection clause under such circumstances.

### 2.    Plaintiff's Factual Recitations are Irrelevant.

Not only do Plaintiff's cases not support its theory of jurisdiction, but the purportedly factual assertions in Plaintiff's motion are of no demonstrable relevance even to that theory. First, Plaintiff notes that its Amended Complaint alleges "a deliberate scheme to breach and circumvent the Settlement Agreement . . . ."  (Motion ¶ 5.)  What Plaintiff fails to provide, however, is (1) any legal or logical connection between its "scheme" allegation and whether the Wives are so "closely related" to the underlying dispute that the forum selection clause should apply to them; and (2) any case law to suggest that this purported scheme is any way relevant to the underlying breach of contract action.  That is, even if the scheme allegation were true (which it is not), such a scheme is irrelevant <u>both</u> to Plaintiff's underlying breach claims in this action (a breach is a breach is a breach, "intentional," "flagrant," or otherwise) <u>and</u> to its theory of jurisdiction as against the Wives.

Second, Plaintiff avers that, as part of the "scheme," the Wives withheld the filing of their joint amended returns and "concealed the fact that they had not been filed."  (Motion ¶ 6.) Again, Plaintiff cites no case law, and advances no argument, to suggest how this allegation is any way relevant either to its underlying claims or to its "closely related" theory of jurisdiction. Indeed, none of the cases it cites – or that the Wives have found – support the notion that such allegations have any bearing on the issue of whether the Wives are "closely related" to the underlying dispute.

14

Third, Plaintiff asserts that the Wives schemed with their Husbands to create a "fake controversy" in the New York State Court Action.  (Motion at pp. 2-3.)  Setting aside the falsity of the allegation, it is of no demonstrable relevance either to Plaintiff's underlying claims or to jurisdiction under the "closely related" doctrine, for the same reasons noted above.

In sum, Plaintiff has advanced a theory of personal jurisdiction that is completely irrelevant to the issue now before this Court, because it lacks any legal support and any relevant factual assertions.  The entire argument is a house of cards that presumes the ultimate issue, *i.e.*, that the Wives are bound by a forum selection clause in an agreement that they did not see, sign, or benefit from.  Plaintiffs have failed to prove the relevance of their written discovery, and their motion should be denied.

### B.   Plaintiff's "Declaratory Judgment" Theory Lacks Any Factual or Legal Support.

Likewise, Plaintiff asserts that the Wives' filing of the New York State Court Action justifies sweeping written discovery, because the Wives are allegedly seeking a declaration of rights under agreements containing the forum selection clause.  (Motion ¶ 6.)  There are two problems with Plaintiff's assertion.

First, it is false.  As noted above, the Wives do not seek to enforce any rights relating to the Settlement Agreements but to enforce rights arising out of the Internal Revenue Code and New York law.  *See supra* at p. 5.

Second, Plaintiff does not cite a single case to support a connection between a declaratory judgment action in one forum and consent to personal jurisdiction in another.  In fact, in its Motion to Compel, Plaintiff does not even mention, much less try to support, the "third-party beneficiary" theory it advanced in both of its complaints.

### C.   Plaintiff's "Agency" Theory Lacks Any Factual or Legal Support.

LP 2341922.2 \ 37753-82139

Finally, Plaintiff avers that its discovery seeks information bearing on whether the Husbands acted as "agents" of the Wives with respect to the Settlement Agreements, thus purportedly subjecting the Wives to jurisdiction in Illinois. This argument borders on the frivolous.

First, Plaintiff cites only one case in support of the "agency theory," *ABN AMRO, Inc. v. Capital Int'l Ltd.,* 595 F. Supp. 2d 805, 821 (N.D.Ill. 2008). *ABN AMRO*, however, is inapposite. In *ABN AMRO*, all of the defendants were corporations, save for one individual who was the sole shareholder, and an officer and director, of one of the corporate defendants. ABN AMRO accused these defendants of fraud when they sold ABN AMRO securities that ABN AMRO could not re-sell in the United States, a fact that the defendants allegedly failed to disclose to ABN AMRO. *Id*. at 817-18.

Although the relationships and the underlying facts were quite convoluted, the District Court ultimately found personal jurisdiction over all defendants to be proper, because (1) several of the defendants had engaged in conduct ***in Illinois*** that gave rise to the claims against them (specific jurisdiction); and (2) these defendants were, at the time of the contacts at issue, acting as agents for the remaining defendants, a fact that the "principal" defendants ***conceded*** during motion practice. *Id*. at 827-30.

*ABN AMRO*, then, stands for the unremarkable proposition that if an agent conducts business in the state of Illinois on behalf of a principal, the courts may impute the agents' conduct to the principal for jurisdictional purposes. *Id*. at 821. This finding reflects hornbook agency law. *ABN AMRO* says nothing, however, about contractual forum selection clauses that specify jurisdiction in a particular venue.

16

Second, even if Plaintiff *had* cited case law suggesting that an agent can bind a principal to a forum selection clause, there is no demonstrable connection between the requirements of an agency relationship and Plaintiff's actual discovery requests.  Indeed, a cursory examination of the theory shows how preposterous it is.  In order for Plaintiff to justify any "agency" discovery, it would have to posit that the Wives completely controlled the Husbands and that the Husbands executed the Settlement Agreements on the Wives' behalf.  Not only is this completely nonsensical where the Wives bore no liability for the Husbands' conduct with respect to the Trading Accounts, but Plaintiff's discovery does not even address issues of purported control over the Husbands, potential trading liability of the Wives, or possible benefit to the Wives from the Settlement Agreements.

**D.     Conclusion**

As the Wives feared, Plaintiff has no legal basis for its personal jurisdiction theories in this action and, consequently, no legal basis for the jaw-dropping volume of written discovery it served, purportedly on this issue.  Setting aside the fact that Plaintiff's Requests to Admit go well beyond any possible jurisdictional issues, and the fact that Plaintiff can pose many of these questions at the Wives' depositions, Plaintiff has simply failed to show any legitimate connection between its Requests and the personal jurisdiction issue before the Court.  As such, the Court should strike Plaintiff's Requests to Admit and deny its Motion to Compel.

**II.     THE WIVES' PRIVILEGE CLAIMS ARE PROPER.**

Even if Plaintiff could somehow prove that its Requests were relevant to personal jurisdiction (which they are generally not), they are still an objectionable attempt to invade recognized discovery and evidentiary privileges.

### A.     The Marital Privilege Defeats Many of Plaintiff's Requests.

### 1.     The Law, and Plaintiff's Assertions, Support the Privilege.

Plaintiff's own statutory and case law citations prove the propriety of the Wives' marital privilege objections, and Plaintiff's own allegations defeat its attempt to circumvent the privilege.  As Plaintiff notes, New York statutory law protects against disclosure of confidential communications made between spouses during a marriage.  (Motion ¶ 24, citing McKinney's CPLR §4502(b).)   Under New York law, then, "the statutory marital privilege protects communication that would not have been made but for the absolute confidence in, and induced by, the marital relationship as distinguished from the daily and ordinary exchanges between spouses." *Id.*, citing *People v. Bennasr*, No. 1005-2008, 209 WL 4067288, *5 (N.Y. Sup., Nov. 19, 2009).[8]

Inexplicably, however, then Plaintiff goes on to argue that its requests do not seek communications induced by the marital relationship but, rather, communications relating to the "Husband's business contracts and . . . the Wives' scheme with their Husbands to deprive [Plaintiff] of use of the tax refund proceeds at its operational headquarters in Illinois." (Motion ¶ 27.)   It appears we have tumbled down the rabbit hole, as it is difficult to imagine communications more sacrosanct as between husband and wife as those concerning an alleged scheme to harm a third party.  What Plaintiff contends are communications in furtherance of civil conspiracy and a scheme to defraud are hardly the stuff of "daily and ordinary exchanges between spouses."  If they were, Plaintiff would have no theory of jurisdiction as to the Wives, because the presumed conversations would be wholly innocuous.

---

[8] Plaintiff's citation to *Securities Settlement Corp. v. Johnpoll*, 512 N.Y.S.2d 814, 816 (App. Div. 1987), is unhelpful, because the opinion provides no description of the documents requested in the subpoena at issue.  The opinion merely reflects that the court found the documents to be "ordinary business records" not subject to the marital privilege.

Plaintiff cannot have its cake and eat it, too.  If the Wives were scheming with their Husbands, as Plaintiff alleges, *all* related communications are privileged from disclosure under New York law, because such communications are prompted by the "affection, confidence, and loyalty" engendered by the marital relationship.  *See People v. Smythe*, 620 N.Y.S.2d 647, 648 (App. Div. 1994).

### 2.      The Wives' Privilege Objections are Valid.

The Wives' marital privilege objections fall into two general categories.  First, many of Plaintiff's requests explicitly seek communications between the Wives and their Husbands regarding the subject matter of this lawsuit.  (*See, e.g.,* Requests to Admit 25-28, 40-46; Document Request No. 6; Interrogatory Nos. 9-11 (cited in Motion ¶¶ 27-28).)  These are clearly privileged under New York law.

Second, the remaining noted requests seek information whose source might have been, or could only have been, one of the Wives' husbands.  (*See, e.g.,* Requests to Admit 16-22, 47-48, 66-72, 95-98, 121; Document Request Nos. 12 (cited in Motion ¶ 27).)  If the Wives' source of information was a communication with their husbands, the exchange is privileged.  And the Wives cannot *deny* Requests to Admit that seek a *disavowal* of a communication from the Husbands without revealing the communication itself (*e.g.,* "Admit that your Husband did *not* tell you . . . .").

Plaintiff advances two half-hearted arguments to overcome the clear import of New York privilege law.  First, Plaintiff questions how the Wives' can claim marital privilege when their Husbands are their nominal adversaries in the New York State Court Action.  (Motion ¶ 28 n.5, 10.)  The answer is simple:  (1) Plaintiff's "scheme theory" renders all communications, even

those relating to the New York action, privileged, and (2) Plaintiff cites no case law to suggest an "adverse party" exception to the marital privilege under New York law.

Second, Plaintiff postulates that some of the confidential marital communications may have been "disclosed to third parties." (Motion ¶ 27.) This weak assertion lacks any factual basis or demonstrated legal relevance, Plaintiff having cited no case law for the proposition that disclosure of a marital communication to *any* third party waives the privilege. It is a throwaway comment in a motion filled with them.

**B.      The Attorney-Client Privilege Defeats Many of Plaintiff's Requests.**

The Wives do not dispute Plaintiff's recitation of the law of attorney-client privilege. Where they part company with Plaintiff, however, is where Plaintiff argues that attorney-client communications are not privileged. For example, Request to Admit 56, 58, and 59 expressly request the content of communications between the Wives and their counsel with respect to the subject matter of pending, or imminent, lawsuits. (*See* Motion ¶ 32.) Such communications are unquestionably protected from disclosure.

All of the remaining requests that Plaintiff notes in its motion share two characteristics. First, the Wives objected to them not only on the grounds of attorney-client privilege, but also on the grounds of the marital privilege. Second, the Wives did so, because the source of information for each of these requests is either the Husbands or counsel, or both. (*See* Motion ¶¶ 31-32.) Either way, they are immune from discovery.[9]

---

[9] In the interests of judicial economy, the Wives are not herein attempting to justify each and every one of their objections, only those that Plaintiff notes in its Motion. And even then, the Wives do not want to consume the Court's time with a detailed examination of each objection. Should the Court deem it necessary to rule on the Wives' objections request-by-request, the Wives would respectfully suggest that a referral to, and hearing before, the Magistrate Judge would remove that burden from the Court.

As in prior sections, Plaintiff expends much energy trying to justify the *relevance* of the disputed requests and completely ignores the fact that relevance, even if proved, does not serve to overcome a privilege objection.  It is simply immaterial whether Plaintiff believes that the disputed requests will support its "scheme" theory or will prove that it was "lulled . . . into believing that the Husbands were complying with their obligations under the Settlement Agreement."[10]  (Motion ¶¶ 31-32.)  The information sought is privileged, and that is where the analysis ends.[11]

### C.    The Work Product and Joint Defense Privileges Defeat Certain of Plaintiff's Requests.

Finally, Plaintiff complains that the Wives have objected to divulging the content of communications between the two of them on the grounds of work product.  (Motion ¶¶ 38-41.)[12]  Specifically, Plaintiff avers that because any such communications do not reveal attorney work product, they are discoverable.  Plaintiff would do well to review Federal Rule of Civil Procedure 26(b)(3), which protects against disclosure of any materials generated, or communications had, in anticipation of litigation, whether by a party or by the party's agent.  Fed. R. Civ. P. 26(b)(3).

Plaintiff does not, because it cannot, dispute that the parties anticipated litigation at the time of the requested communications.  Indeed, Plaintiff's entire "scheme" theory hinges on just

---

[10] Perhaps evidencing a bit of "argument fatigue," Plaintiff does not even attempt to explain the legal relevance of its alleged state of mind in a breach of contract action.

[11] In a parting shot, Plaintiff avers that the Wives cannot "hide behind the attorney-client privilege because a fraud was committed on the New York court."  (Motion ¶ 32.)  This would be an extremely serious allegation, were it not for the fact that Plaintiff provides not a shred of evidence, or legal analysis, to support it.  It is, once again, another throwaway argument.

[12] The Wives are not addressing their accountant-client privilege objections, because they concede that New York law does not specify such a privilege.  Nonetheless, many of the Requests that this objection covered also fall under other stated privilege objections (*e.g.,* Requests to Admit 81-85 and 95-96, the marital privilege).  In addition, the Wives have already produced all requested accounting/tax documents available to them in response to Plaintiff's Requests for Production.  Finally, because Plaintiff wishes to subject the Wives to Illinois law, and Illinois law recognizes an accountant-client privilege, the Wives felt compelled to interpose the objection.

such communications.  Nor can Plaintiff dispute that the Wives are "parties" or that their interests are aligned in both lawsuits.  As such, not only are the Wives' communications work product under Rule 26, they are also privileged under the common interest doctrine and the joint defense privilege.  *See, e.g.*, *Aetna Cas. and Sur. Co. v. Certain Underwriters at Lloyd's London*, 676 N.Y.S.2d 727, 732 (N.Y. Sup. 1998) (common interest privilege applies to "communication between counsel and parties with respect to legal advice in pending or reasonably anticipated litigation in which the joint consulting parties have a common legal interest.").

### D.      Conclusion

The Wives' privilege objections are, collectively and individually, fully supported by the relevant law and rules.  Although Plaintiff may strive to justify the relevance of its objectionable requests, its efforts are of no moment, because most of its requests unequivocally seek information protected from disclosure by the marital, attorney-client, work product, and joint defense privileges.  Consequently, the Court should deny Plaintiff's motion in its entirety.

### CONCLUSION

Plaintiff's written discovery requests are, for the most part, irrelevant to any legitimate theory of personal jurisdiction over the Wives.  They are also improper, because they seek information protected by various legal privileges.  And they are a waste of time and resources, because Plaintiff can pose its questions in deposition, rather than asking the Wives – who have not been shown to be subject to personal jurisdiction in Illinois – to expend the time and money to answer 252 irrelevant, objectionable Requests to Admit.

For all of the foregoing reasons, Samantha Garbers-Adams and Lisa Walford respectfully request that the Court deny in its entirety Plaintiff's Motion to Compel and to Extend the

Discovery Schedule and that it grant the Wives such other and further relief as the Court deems

just and proper.

Dated: May 3, 2010

                              Respectfully submitted,

                              /s/Kurt Stitcher
                              Kurt Stitcher
                              Amy A. Pines
                              Elizabeth B. Vandesteeg
                              Levenfeld Pearlstein, LLC
                              2 North La Salle Street, Suite 1300
                              Chicago, IL 60602
                              312-346-8380 (*telephone*)
                              312-346-8434 (*facsimile*)
                              Firm No. 36518


                              Michael R. Koblenz, Esq. (1673078)
                              Sara F. Lieberman, Esq. (4399655)
                              Mound, Cotton, Wollan and Greengrass
                              One Battery Park Plaza
                              New York, NY 10004
                              (212) 804-4200 (*telephone)*
                              (212) 344-8066 (*facsimile)*


                              *Attorneys for Defendants Samantha Garbers-Adams*
                              *and Lisa Walford*

LP 2341922.2 \ 37753-82139